NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200625-U

NO. 4-20-0625

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 11, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| LEILA JACKSON, | ) | No. 18CF735 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding that:

(1) defendant, by failing to make an offer of proof, forfeited her claim that the trial court erred in ruling she would open the door to the State introducing evidence of her past incident of domestic violence if she introduced evidence of the victim's character for violence,

(2) the admission of defendant's statement that she was "quick with a knife" was harmless error,

(3) certain allegedly disparaging and hostile remarks of the trial court did not constitute error,

(4) the State did not erroneously impeach defendant with her postarrest silence, and

(5) the cumulative effect of any trial errors did not deprive defendant of a fair trial.

¶ 2        Defendant, Leila Jackson, appeals her conviction for first degree murder. Defendant argues error occurred at her trial when: (1) the trial court, in considering her motions *in limine*, ruled that the State could introduce evidence of a prior domestic incident between defendant and her girlfriend if defendant opened the door by introducing evidence of the victim's violent character and prior acts of violence; (2) the court allowed the State to present evidence of a statement she made in connection with an unrelated incident—namely, that she was "quick with a knife;" (3) the court made comments that showed hostility toward and disparagement of defense counsel; and (4) the State improperly impeached defendant with her postarrest silence. Defendant also argues that the cumulative effect of these errors resulted in an unfair trial. We affirm.

¶ 3                            I. BACKGROUND

¶ 4        Defendant was charged with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2018)) for causing the death of Quantez Brown by stabbing him with a knife. One of the four counts was later dismissed on the State's motion.

¶ 5                    A. Defendant's First Motion *In Limine*

¶ 6        Defendant retained private counsel, and counsel filed a motion *in limine* seeking to introduce evidence of Brown's violent character in support of defendant's claim of self-defense. Defendant sought to introduce her own testimony, as well as testimony from members of the community concerning Brown's violent character and specific instances of Brown's prior crimes of violence. Defendant alleged that evidence of her knowledge of Brown's violent character was relevant to show the effect of this knowledge on her state of mind at the time of the incident and that evidence of Brown's prior crimes of violence against women was relevant to support her theory that he was the initial aggressor. Defendant also sought to bar the

- 2 -

State from introducing evidence of a prior domestic incident between defendant and her former girlfriend and evidence that defendant was found to be in possession of a knife after that incident.

¶ 7    The State filed a response to defendant's first motion *in limine* and a cross-motion *in limine*. The State argued that the introduction evidence of certain past incidents concerning Brown should not be introduced to show the reasonableness of defendant's state of mind in support of her claim of self-defense. The State asserted there was no evidence that defendant was aware of these prior incidents at the time of the offense. The State noted that defendant stated during her interview with the police that she did not know of any other specific instances of Brown becoming violent with women and did not know of anyone in particular that Brown had beaten in the past. The State conceded that two prior incidents of domestic violence involving Brown were admissible to support defendant's theory that the victim was the initial aggressor.

¶ 8    The State also requested that evidence of defendant's prior domestic dispute with her girlfriend be admitted. The State asserted that, when defendant was interviewed concerning the domestic incident, she stated that she did not "pull out" a knife during the altercation even though she would be "quick" to do so. She said she did not pull out a knife "this time" because she loved her girlfriend. When the interviewing officer confronted defendant with the fact there was blood on a knife that was in her possession, she said it was from her own hands. The State acknowledged that the knife from this prior incident was not the same knife involved in the instant case.

¶ 9    The State argued it should be permitted to introduce evidence of this uncharged domestic incident to show that defendant was the initial aggressor in the instant case. The State

argued the probative value of this evidence outweighed the danger of unfair prejudice to defendant because defendant planned to introduce evidence of prior domestic incidents involving Brown to support her theory that the victim was the initial aggressor.

¶ 10		At a hearing on defendant's motion *in limine*, defense counsel stated that defendant sought to introduce evidence of two instances of domestic violence involving Brown for the dual purposes of showing the reasonableness of her state of mind in acting in self-defense and for showing that Brown was the initial aggressor. Defense counsel stated that, if defendant chose to testify, he expected her testimony would be consistent with her statements to the police indicating she had a general awareness of Brown's violent nature.

¶ 11		The trial court ruled that defendant would be barred from presenting evidence of Brown's violent nature to show her own state of mind and the reasonableness of her actions in support of her claim of self-defense unless she presented more facts showing she had knowledge of Brown's violent nature. The State indicated in its response that defendant had indicated in a police interview that she knew Brown was a violent person because it was the "word on the street" and she could tell by the way he was "getting rowdy" with her. The court ruled these statements were insufficient to show defendant knew of Brown's violent character. The court ruled defendant would be permitted to present evidence of two domestic incidents and a criminal damage to property incident involving Brown in support of her theory that Brown was the initial aggressor but only if she could establish these incidents were relevant to the question of Brown's aggressive and violent behavior.

¶ 12		The trial court also ruled that the State would be permitted to introduce some evidence of defendant's prior domestic violence incident to support its theory defendant was the initial aggressor if defendant asserted self-defense. The court ruled the State would not be

permitted to introduce evidence that defendant had a knife in her purse during the altercation with her girlfriend.

¶ 13　　　　The trial court also ruled that defendant's statement to the police that she would be "quick" to pull a knife was admissible if the State established a proper foundation for it because it was "relevant and probative to the issues in the present case, especially if Defendant is asserting self-defense." The court acknowledged that the statement was prejudicial to defendant but found the prejudicial impact of the statement did not substantially outweigh its probative value.

¶ 14　　　　Private counsel was subsequently permitted to withdraw, and the public defender's office was appointed to represent defendant.

¶ 15　　　　　　　　　B. Defendant's Second Motion *In Limine*

¶ 16　　　　The assistant public defender assigned to represent defendant filed a second motion *in limine* asserting defendant no longer sought to introduce evidence of any individual's peaceful or violent character and would not introduce evidence of Brown's prior bad acts. The motion requested that the court bar the State from introducing evidence of the prior uncharged domestic violence incident involving defendant and her former girlfriend.

¶ 17　　　　At the hearing on the second motion *in limine*, defense counsel asserted that he believed the court's ruling on the first motion *in limine* was "correct under the circumstances." Defense counsel stated that the defense no longer intended to introduce evidence of uncharged domestic violence incidents involving Brown. Defendant argued that, as a result, the State should be barred from introducing evidence of defendant's uncharged prior incident of domestic violence, including defendant's statement to the police in connection with that incident that she would be "quick" to pull a knife.

¶ 18    The court ruled that the State would be permitted to introduce defendant's prior statement that she would be quick to pull a knife because the probative value of the statement outweighed its prejudicial impact. The court also found that the statement "[went] to a number of issues besides the self-defense issue." The court further ruled that the State would not be permitted to present evidence of defendant's alleged prior domestic incident unless defendant "open[ed] the door." The court found that the probative value of defendant's prior domestic incident would be substantially outweighed by its prejudicial impact if the defense did not introduce evidence of Brown's prior bad acts.

¶ 19                    C. The State's Motion *In Limine*

¶ 20    The State filed a motion *in limine* asserting that the parties had been unable to agree on what redactions to make to the video recording of defendant's interview with the police and requesting the court's guidance. The State attached a transcript of the interview with its proposed redactions marked. Defendant filed a response stating that she objected to the State redacting all references to Brown's violent character and not redacting references to defendant's prior domestic violence incident.

¶ 21    At a hearing on the State's motion, the trial court ruled on each disputed redaction. References to defendant's prior domestic incident, Brown's violent character, and Brown's prior acts of violence were redacted pursuant to the court's ruling on defendant's second motion *in limine*.

¶ 22    A transcript appearing in the record along with the State's motion *in limine* and the court's ruling on the motion *in limine* indicate that several specific statements concerning Brown's violent character were redacted from defendant's interview. These statements included that defendant had heard that Brown hit women, Brown had told defendant he had beat up a

woman before, and defendant had heard that Brown was "beatin' on" his girlfriend. Defendant also stated it was the "word on the street" that Brown beat women and defendant could tell he did by the way Brown was "getting rowdy" with her. In the interview, defendant also said she had not talked to a woman that Brown had beaten, and she did not know of any specific instances of defendant "putting his hands on females" in the past. Defendant said that she had heard defendant threaten a woman named Izzy, and he brought his girlfriend to fight Izzy. The interviewing officer asked defendant if Brown had ever talked about shooting somebody, and defendant said Brown talked about it "all the time." All of these statements were ordered redacted from the video of defendant's police interview.

¶ 23                                        D. Trial

¶ 24            A jury trial was held. On two occasions early in the trial, the defense made objections that the court addressed outside the presence of the jury. Each time, the court advised the parties that it wanted to resolve all matters that needed to be addressed outside the presence of the jury in advance so that the jury was not repeatedly moved in and out of the courtroom. When the jury reentered the courtroom after defense counsel's second objection, the court stated:

> "All right. Thanks, folks. Welcome back. Couple of things. First let me remind you that when you're asked to leave the courtroom so that that way the Court can address issues that have been raised in the form of objections or otherwise by either counsel that remember that you are hopefully not getting angry, mad or upset at anyone. But if you do, get mad at me. It's my rule as opposed to the attorneys."

¶ 25            The State called Antwan James as a witness. James testified that he knew defendant through mutual friends, and he did not have a problem with her. He saw defendant

approximately three times per week prior to the incident. James had a close relationship with Brown. James's mother used to babysit Brown, and Brown was like a brother to James. James had also known Terrell Moon for a long time. He also knew Semaj Collins, though not as well as Brown and Moon.

¶ 26    James testified that, on the night of the incident, he went to defendant's residence at approximately 11 p.m. to meet up with Collins. When he arrived, defendant was sitting on the porch and Collins was standing in front of her. James and Collins talked about going to the liquor store. Brown and Moon then arrived. Collins and Moon spoke in front of defendant's house, and James spoke with Brown in front of the house next door. James saw defendant enter her house alone while Collins and Moon were having a conversation. She exited the house wearing a gray sweater, which she had not been wearing before, and she sat down on the porch. James did not see anything in her hands.

¶ 27    James testified that defendant entered her house a second time with Collins. They stayed inside for approximately one minute and then exited the house. Moon appeared "startled" and said defendant "ha[d] a knife." Moon walked over to James and Brown, and Collins stood in front of defendant's residence. Brown walked over to Collins and began having a conversation with him. Brown then began talking to defendant. He was standing approximately six inches from defendant. James did not know the nature of Brown's conversation with defendant, but he did not hear Brown make any threats. James did not see Brown point his finger at defendant's head or touch her on or about her face. James did not hear defendant say anything to Brown.

¶ 28    James testified that Brown then walked over to where he and Moon were standing and said defendant had stabbed him. At first, James thought Brown was joking. However, James

then saw blood and knew that Brown was serious. Defendant went into her house with a knife in her hand.

¶ 29    James did not see the stabbing occur. He first saw the knife in defendant's hand when she went inside her house afterward. James told Moon to call the police. Brown fell to the ground, and they put him in someone's car to drive him to the hospital. Defendant exited her house and fled. James searched for defendant but he could not find her.

¶ 30    On cross-examination, defense counsel asked James about his forgery conviction, which he had already testified about on direct examination. The State objected on the basis that the conviction had already been addressed on direct examination. The following exchange occurred:

"THE COURT: Sure. Where are we going with this?

MR. MORAN [(DEFENSE COUNSEL)]: Your Honor, I'm impeaching the witness, and I'm also going—

THE COURT: He fronted it.

MR. MORAN: I know.

THE COURT: Okay. And so was there additional information over and above what was previously relayed to the jury concerning this defendant's [*sic*] convictions that you think would be relevant because I will also give the jury at some point in time, perhaps now, a limiting instruction as to how it is that the jury may consider it.

MR. MORAN: Yes, your Honor. It's my client's constitutional right under the Sixth Amendment to—

THE COURT: Are you going to have a speaking objection? Because if you are, then we'll take the jury out again. This is a speaking objection. Please take the jury out."

After James and the jury left the courtroom, defense counsel indicated that he was going to talk about James's probation status and whether there were any promises or expectations of leniency, whether real or imagined. The court stated:

"I agree. And but for the fact that you had started to go into a speaking objection by referring to constitutional rights, which would be inappropriate to relay in the form of an objection for the jury, then I would have agreed with you had you just said that he is on probation or there may have been promises made and that's what I need to get into. So does the State agree or disagree?"

The State agreed that this was a legitimate area of cross-examination. James and the jury reentered the courtroom, and the cross-examination resumed.

¶ 31　　　　Scott Matthewson testified next for the State. Matthewson stated he was employed as a crime scene detective at the time of the incident, and he examined the scene of the incident on the night that it occurred. He took photographs of the scene of the incident showing blood stains on the sidewalk near defendant's residence, which were admitted into evidence. Matthewson later searched and photographed defendant's residence. He located a silver-handled knife in the sink that was submerged in water. He located several other knives in the kitchen area as well.　He identified photographs of the knives and the actual knives, which were admitted into evidence.

¶ 32　　　　Dr. Scott Denton, a forensic pathologist, testified that he performed an autopsy on Brown. Toxicology reports showed that methamphetamine and alcohol were present in Brown's

blood. Denton testified that Brown's cause of death was hypoxic ischemic encephalopathy due to a stab wound to the chest. That is, a stab wound to Brown's chest caused a lack of blood flow and oxygen to Brown's brain. Denton opined that the silver-handled knife collected from the scene could have made the wound to Brown's chest.

¶ 33        Detective Jared Roth testified that he investigated the stabbing in the instant case. Shortly after the incident, Roth learned that someone had called 911 because she wanted to share some information concerning the incident. Roth stated he had listened to this 911 call, and defendant was the individual who had placed it. The following exchange occurred between the prosecutor and Roth:

"Q. And do you see the individual that you know as Leila Jackson in the courtroom here today?

A. I do.

Q. Would you please point her out and identify her by an article of clothing she is wearing?

A. She is sitting to the front of me, up to my left, wearing a blue jacket, I believe.

Q. Dark-colored jacket?

A. Yes.

MR. MORAN [(DEFENSE COUNSEL)]: I'm sorry, your Honor, may the record reflect that—

[ASSISTANT STATE'S ATTORNEY]: What color mask—

MR. MORAN: Well, do you have—

THE COURT: Just a minute. Don't interrupt.

- 11 -

MR. MORAN: Let the record reflect that the officer has identified my cocounsel.

THE COURT: No, it won't. It will indicate that he described a person with the characteristics. And I believe that because there are similar characteristics between cocounsel and the defendant that [the prosecutor] was attempting to further ascertain if the witness was able to identify between your cocounsel and the defendant. And you may.

BY MS. WAGONER [(ASSISTANT STATE'S ATTORNEY)]:

Q. Do you know which color mask? Is it the blue mask or the black mask?

A. I believe she is wearing the black mask.

THE COURT: Okay. That's all right. The record will now reflect that the witness has identified based upon his statement, I believe that she is wearing a black mask, that he has identified Ms. [Tiara] Wilson."

¶ 34    An audio recording of defendant's 911 call, which had previously been admitted into evidence, was played for the jury. In the recording, defendant is heard saying she was calling to turn herself in because she had stabbed someone. Defendant is further heard saying she was "in danger for [her] life," and she asks if someone could come pick her up.

¶ 35    Roth testified that he and his partner picked up defendant and drove her to the police department. Roth escorted defendant to an interview room and questioned her. Defendant was taken into custody after the interview.

¶ 36    Roth testified the interview was audio and video recorded. A copy of the recording, which had been edited pursuant to the court's order on defendant's second motion *in limine*, was admitted into evidence and played for the jury. Roth testified that defendant

referred to Brown as "Bam" or "Bambino" throughout the interview. She also referred to Collins as "Ghost." During the interview, defendant stated that she only knew these men by their nicknames.

¶ 37 In the recorded interview, defendant stated that she met Brown through a girl named Izzy seven months prior to the incident. At first, she and Brown were "liking on" each other, but she cut ties with him after she learned he had a girlfriend. Brown's girlfriend, Tamra, had contacted defendant and threatened to "beat [her] a***." Brown continued to try to talk to defendant, but she "was blowing him off" because he had a girlfriend. Defendant saw Brown approximately four times per week, but they often did not speak.

¶ 38 Defendant said that Brown was "always threatening [her]." Brown repeatedly told her that he would "beat [her] a***" or have someone else, like his sisters and cousins, do it. Defendant said that the threats had been going on for approximately two months. It had occurred on more than five occasions. On one occasion, Brown was at the residence next to defendant's residence. She did not say anything to him, but she looked at him. He asked defendant what she was looking at and told her he would come over and "smack the s*** outta" her.

¶ 39 Defendant stated that, a couple weeks prior to the incident, Brown was hanging out with some of his friends near defendant's residence. He was drunk and was "talking reckless" to defendant. Defendant told him to "get out of [her] face." She told him he was just mad because she did not want to "mess with" him and that he had no reason not to like her. Defendant asked Brown why he was trying to argue with a woman. She said that ever since she "bust[ed] him out" in front of his friends that night, he started "really talking crazy." He called her names and claimed, presumably to others in the area, that he had sexual relations with her.

¶ 40          Defendant said that on the night of the incident, she was sitting on her porch smoking a cigarette and talking to Collins. She said that Collins was someone she associated with but was not really her friend. Two men defendant did not know walked up. Brown walked up approximately 30 seconds later. Brown started talking to Collins. Brown then approached defendant and asked if they could talk. Defendant told Brown she did not have anything to say to him and asked him to leave. He refused.

¶ 41          Defendant said that Brown then said: "Aight [*sic*] b***, I'll beat your motherf*** a*** right now." He said over and over that he would "beat [defendant's] a***." He started putting his hands in defendant's face and threatening her. Defendant said that Brown poked her in the head with his finger. She demonstrated by poking herself in the head with her finger in the shape of a gun. An officer asked defendant if the only physical contact Brown had with her was a finger to the face, and she said yes. Defendant told Brown to stop several times, but he did not. Defendant said she "felt scared for [her] life." She believed Brown would hit her. She grabbed a kitchen knife that was lying to the side of her. The knife was outdoors because she had been barbecuing a couple days earlier. She stabbed Brown one time in the stomach with the knife. Brown said: "This b*** just stabbed me." He walked toward the other men and fell down. Defendant went inside, washed the knife, and put it in her sink. She then left and went to her father's residence because she was scared. She called her mother, and she then called the police.

¶ 42          Defendant said she felt she needed to stab Brown because he was putting his hands in her face like he was about to hit her, and she felt threatened. She believed Brown was really going to do what he said he was going to do. Defendant did not know if he was going to beat her, but she did not "put it past him." She intended to hurt Brown to get him to stop what he was doing; she did not intend to kill him. The night of the incident was different from prior

occasions because Brown had never been in defendant's face before like he was that night. On other occasions, he had threatened her from across the street. Defendant acknowledged that Brown had not caused any injuries to her that night. Defendant noted that she was outside alone with four men at the time of the incident, and she said she did not know what they were capable of. She said she had been hanging out with Collins, but he was Brown's friend. She did not know the other two men. Defendant said that she was not from the area and did not know "what these people [were] capable of."

¶ 43    Defendant had been beaten before by her ex-boyfriend, but Brown had never beaten her. Brown had never touched defendant before the incident, he had just made verbal threats. Defendant did not see a weapon on Brown that night, but he had a backpack and could have had a weapon in the backpack. Defendant did not know whether Brown ever carried a gun or knife.

¶ 44    In the recorded interview, an officer asked defendant if she ever felt like she could get up and walk inside the house. Defendant said: "Yeah, I feel like I should've went [sic] in the house." The officer asked her why she did not do so. She replied: "I was just so scared." Defendant said that she felt like "it would've kept going" if she had gone inside the house. She said: "He would've did [sic] something, bust a window. I don't know what he's capable of. I don't know him like that. I don't know him personally." She said she knew Brown "to some extent" because of "the way he be walking around Bloomington doing what he doin'." An officer asked what Brown had been doing. Defendant replied: "Talking crazy to females. Like he always talkin' crazy about a female. Always."

¶ 45    After the video of defendant's interview was played, defense counsel questioned Roth about whether he testified before a grand jury concerning the information he had gathered in connection with the instant case. Roth indicated that he did. The following exchange occurred:

"Q. Okay. And the purpose of the Grand Jury is to present—

MS. WAGONER: Your Honor, I'm going to object at this point. I'm not quite sure why we are getting into Grand Jury proceedings. The decisions to bring an indictment and present it to a Grand Jury is that of the State's Attorney.

THE COURT: Okay, I concur. I mean, if there is going to be any attempt to challenge this witness with a prior statement under oath presented at a previous proceeding, then let's get there. Otherwise, the Grand Jury proceeding is a means by which the Grand Jury, having received evidence, determines if there's enough evidence for charges to be brought.

MR. MORAN: That's where I was going with this. Thank you, your Honor.

THE COURT: Okay.

MR. MORAN: So I'll just get to it.

[MR. MORAN]: So you testified at the Grand Jury.

Q. ***

Your Honor, may I approach the witness?

THE COURT: I'm not sure why you are approaching. What is it that you are attempting to impeach him with? What he's testified to today that you believe is inconsistent with his testimony at the Grand Jury? Right now we've just had a general discussion about him providing testimony at the Grand Jury. So you can

- 16 -

approach the witness if there's going to be something you are asking him about an inconsistent statement, but you haven't asked him to acknowledge any statement at this point in time. So, not yet, to answer your question.

MR. MORAN: Okay.

[MR. MORAN]: So, you told the Grand Jury that a female and two males dropped off—

MS. WAGONER: Your Honor, I'm going to object. He has to be confronted with a question and an answer.

THE COURT: I agree, I agree. Sustained. Improper method of impeachment.

MR. MORAN: Okay.

THE COURT: Or improper method of attempt at impeachment."

¶ 46     Defense counsel subsequently asked Roth about a statement he made during his grand jury testimony, and the State objected on the bases of relevancy and it being outside the scope of direct examination. The trial court asked defense counsel what testimony Roth had given at trial that counsel believed was inconsistent with the grand jury testimony. The trial court then told defense counsel that he needed to ask Roth if he had previously testified to something, ask if his prior testimony was true, and then confront him with the allegedly inconsistent grand jury testimony. The court stated that just questioning Roth about answers he gave during his grand jury testimony was not proper impeachment.

¶ 47     Defense counsel asked Roth if he had interviewed victims of crimes as a detective, and he indicated that he had. Defense counsel asked if victims acted differently from

- 17 -

one another, and the State objected on the basis of "generality." The following exchange occurred:

"THE COURT: All right. How is this relevant or material? I mean, get— what is it that you're leading towards in other words?

* * *

MR. MORAN: I'm merely trying to elicit that there's no proper way for a victim to behave in this case, because it's our contention that Ms. Jackson—

MS. WAGONER: Objection to what the contention is. If we need to take the jury out, maybe you should.

THE COURT: Sure. No, we don't. This is a speaking objection. Ask the question, and we'll take it one at a time. If you indicate as to what it is you are trying to establish from the witness, maybe you can go directly to that final question and he can respond to it and it would be relevant, but, at this point in time, it's irrelevant. So your next question."

¶ 48 Defense counsel then asked Roth if defendant became a suspect after her interview, and Roth said that she did. Defense counsel asked Roth how he would have felt if he had "realized that [he was] wrong" after arresting defendant. The State objected, and the trial court sustained the objection. Defense counsel stated: "Your Honor, I'd like—" The court replied, "You may not. It's an improper line of inquiry, all right. You can make your record after the jury is out, but we are not going to have speaking objections on a totally irrelevant line of questioning."

¶ 49 A recording of a 911 call placed by Terrell Moon on the night of the incident was also admitted into evidence and played for the jury. In the recording of the call, Moon is heard

saying that he needed an ambulance because a girl just stabbed his cousin, his cousin could not breathe, and his cousin was "bleeding out fast." Moon described the girl who had stabbed his cousin and said that she was walking away.

¶ 50 Todd Keil, a former police officer, testified that he spoke to defendant about an unrelated incident nine days before Brown's death. During their conversation, defendant told Keil, " 'I'm quick with a knife.' "

¶ 51 The State rested.

¶ 52 Defendant testified, on the date of the incident, she worked until 10 or 11 p.m. Collins, who she knew only by the nickname "Ghost" at the time, came over to her residence after work. Defendant testified she had known Collins for a few months prior to the incident. He came to her house approximately twice per week. On the night of the incident, they watched a movie together and talked for a while. Defendant told Collins that he needed to leave because she needed to go to sleep. They walked out onto the porch, and defendant smoked a cigarette. Two men then walked up. Defendant told officers shortly after the incident that she did not know the two men, but she testified at trial that she knew one of them was James. She had known James for approximately one month, but she did not know him well. She did not know the second man.

¶ 53 A couple minutes later, Brown approached defendant's residence. Brown repeatedly asked defendant if he could talk to her. She said he could not and that he needed to leave. Defendant asked Brown to leave approximately four to five times. Brown then "started getting aggressive" with defendant and calling her names. Defendant testified that Brown pointed his finger in her face in the shape of a gun. The record indicated that defendant demonstratively held her finger in the shape of a gun to her left temple as she said this. Brown

- 19 -

gritted his teeth and told her he was going to "f*** [her] up."  Brown then grabbed defendant by her shirt. Defendant feared for her life because she believed defendant would do what he said he was going to do. She reached for a knife, stabbed Brown, and ran inside her house. She then went to her father's house and called 911. The person she spoke to told her to go to the police station. She asked if someone could come pick her up because she feared for her life.

¶ 54　　　　Defendant stated that, during her interview with the police, an officer asked her why she did not go inside her house during the incident. She told the officer that she wished she would have gone back inside the house before the incident occurred when she saw Brown walking up to her house. Defendant said she did not have a working phone inside her house and no one else was present in the house. Later during her testimony, defendant said that she did not go into the house before the stabbing because she did not know whether Brown would have followed her. She acknowledged that her door had a lock, but she said Brown could have still kicked in the door.

¶ 55　　　　Defendant testified she met Brown in January 2018. He became threatening towards her early on. Defendant had refused to have sexual relations with Brown because he had a girlfriend. She believed that was why Brown became threatening toward her. Defendant acknowledged that she told officers in July 2018 that Brown became threatening toward her a couple months earlier, but she said she was just giving a guess of when it started. She said she was in shock when she was talking to the officers. She was afraid during the incident because Brown threatened to "beat [her] ass" or get someone else to do it.

¶ 56　　　　On cross-examination, defendant acknowledged that she did not tell officers shortly after the incident that Brown had grabbed her by the shirt, gritted his teeth, and said he was going to "f*** [her] up" before she stabbed him. The prosecutor asked defendant why she

did not disclose these additional facts until trial. Defendant replied that she was in shock during the interview and felt like the officers were "throwing answers down [her] throat." The following exchange occurred:

"Q. Now, so the reason today that you are saying that you didn't—you weren't able to articulate that to the officer at the time is because you were in shock, right?

A.: Right.

Q.: Have you been in shock for the last almost two years?

MS. WILSON [(DEFENSE COUNSEL)]: Objection.

THE COURT: She can answer the question. Overruled.

[DEFENDANT]: In shock for two years? I mean, yeah.

* * *

Q. At any time, did you advise or attempt to advise anybody that the incident that you initially described was categorically different than what you originally told the officers?

* * *

A. No."

¶ 57 The following exchange then occurred when defense counsel was questioning defendant on redirect examination:

"Q. Do you think that you could have protected yourself against him?

A. No.

Q. Why?

- 21 -

MS. WAGONER: Objection as to why. Irrelevant. She's already indicated that she didn't feel she could.

THE COURT: Well, there's been an indication at least six or seven different times, if you include the interview, as to why. So, as to the specific basis of the objection, it's overruled. If it's asked and answered, then it will be sustained.

MS. WILSON: Thank you, Judge.

MS. WAGONER: We would object. Asked and answered.

THE COURT: Sustained."

¶ 58    The defense rested, and closing arguments were given. The jury ultimately found defendant guilty of first degree murder.

¶ 59                                    E. Posttrial

¶ 60    Defendant filed a motion for a new trial arguing that the State failed to prove the elements of the offense beyond a reasonable doubt and certain rulings and actions of the court deprived defendant of a fair trial. Defendant argued, *inter alia*, that, prior to the trial, the court erred in ruling that if defendant opened the door by presenting evidence of Brown's character, then defendant's character would be at issue. Defendant argued that, pursuant to Illinois law, the prosecution may attack a defendant's character only when the defendant puts her own character at issue, and introducing character evidence concerning the victim does not put the defendant's character at issue. Defendant also argued that the admission of Keil's testimony that defendant was "quick with a knife" was improper for the same reasons. Defendant also argued the trial court made numerous errors and inconsistent rulings that favored the prosecution throughout the trial.

¶ 61 The trial court denied the motion for a new trial. Following a sentencing hearing, the court sentenced defendant to 23 years' imprisonment on one count of first degree murder. This appeal followed.

¶ 62 II. ANALYSIS

¶ 63 A. Motions *In Limine*

¶ 64 On appeal, defendant argues the trial court erred in ruling on her motions *in limine* that the State could introduce evidence of an uncharged prior domestic incident between defendant and her former girlfriend if defendant introduced evidence of Brown's violent character. Defendant also argues the court erred in ruling on her second motion *in limine* that evidence of her prior statement that she was "quick with a knife" was admissible regardless of whether she introduced evidence of Brown's violent character. We address each argument in turn.

¶ 65 1. *Allowing the State to Introduce Evidence of Defendant's Uncharged Domestic Incident if Defendant Presented Evidence of Brown's Prior Bad Acts*

¶ 66 Defendant argues that the trial court erred in ruling that the State would be permitted to introduce evidence of an uncharged prior domestic incident between defendant and her former girlfriend if defendant "open[ed] the door" by introducing evidence of Brown's violent character and prior bad acts to show that he was the initial aggressor. Defendant contends that the probative value of evidence of her prior domestic altercation could not have outweighed its prejudicial impact unless she put her own character at issue by introducing evidence to show she was a peaceful person.

¶ 67 The State asserts that defendant forfeited review of this issue by failing to make an offer of proof identifying any evidence of Brown's violent character and prior acts of violence

that she would have introduced absent the court's allegedly erroneous ruling. "It is well settled that the key to preserving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court and a defendant's failure to make such an offer results in forfeiture of the issue." *People v. Staake*, 2017 IL 121755, ¶ 51.

> "Such an offer of proof serves dual purposes: (1) it discloses to the court and opposing counsel the nature of the offered evidence, thus enabling the court to take appropriate action, and (2) it provides the reviewing court with an adequate record to determine whether the trial court's action was erroneous." *People v. Pelo*, 404 Ill. App. 3d 839, 875 (2010) (abrogated on other grounds by *People v. Veach*, 2017 IL 120649).

"As a general rule, a trial court's ruling on a motion *in limine* regarding the introduction or exclusion of evidence is reviewed under an abuse of discretion standard." *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20.

¶ 68 Here, defendant made no offer of proof identifying evidence of Brown's violent character that she would have introduced at trial if the court had not ruled that introducing such evidence would open the door to the State introducing evidence of her prior act of violence. Defendant contends that no offer of proof was necessary in the instant case because the trial court's error was a legal error unrelated to the substance of the excluded evidence, and this court can determine whether it was an error without reviewing the excluded evidence.

¶ 69 Defendant relies on *People v. Lynch*, 104 Ill. 2d 194, 202 (1984), in support of her argument that no offer of proof was necessary. In *Lynch*, the appellate court held that the trial court erroneously ruled that the defendant could not present evidence of the victim's prior battery convictions as evidence of the victim's violent character to show that the victim was the

aggressor. *Id.* at 201-02. The *Lynch* court held that no offer of proof was necessary in that case because there was "no question" that the battery convictions could have been proven such that the only issue for the appellate court to decide was the legal issue of whether the convictions were admissible. *Id.* at 202.

¶ 70        Unlike *Lynch*, the instant case does not present a situation in which there is "no question" that the excluded evidence could be proven. It is unclear exactly what evidence of Brown's character for violence defendant would have introduced absent the court's allegedly erroneous rulings on the motions *in limine*. In the proceedings on the motions *in limine*, defendant indicated that she wished to present evidence of Brown's uncharged prior incidents of domestic violence, but the record contains no specific information concerning these incidents.

¶ 71        On appeal, defendant contends that the record contains specific evidence of Brown's violent character that was not introduced at trial as a result of the trial court's allegedly erroneous ruling—namely, defendant's own statements in her police interview concerning Brown's violent character that were redacted pursuant to the court's rulings on the motions *in limine*. While the record might contain such information, defendant never specifically identified the statements for the trial court in an offer of proof as was required. In addition, the record is devoid of information establishing a sufficient foundational basis for these statements. While defendant indicated in her statement that she knew Brown and had heard that he had beaten up his girlfriend, she also said that she did not know Brown "personally" and repeatedly said that she did not know many people in the community. In the absence of an adequate foundation, defendant is unable to argue the statements would have been admissible. See *Pelo*, 404 Ill. App. 3d at 877 ("Because defendant failed to make an adequate offer of proof *** we have no way of knowing whether the excluded testimony would have (1) been admissible or

- 25 -

(2) assisted the jury in its determination of guilt.") Moreover, it is uncertain that defendant's redacted statements from her interview would have been presented at trial absent the trial court's ruling on the motions *in limine*. It is possible that the State would have simply chosen not to offer evidence of defendant's interview with the police at trial if defendant's statements concerning her knowledge of Brown's reputation for violence were not subject to redaction.

¶ 72    Accordingly, we conclude that defendant has forfeited review of this issue by failing to make an offer of proof, and the inclusion in the record of defendant's redacted statements from her police interview does not excuse her failure to make an offer of proof.

¶ 73    Defendant argues that, in the event we find that she forfeited the issue by failing to make an offer of proof, we should excuse her forfeiture on the basis that her trial counsel was ineffective for failing to make an offer of proof. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 74    Here, defendant cannot show that she was prejudiced by her trial counsel's failure to make an offer of proof because it is unclear counsel could have proffered evidence establishing a foundational basis for her interview statements. And even if we were to assume that an offer of proof would have established an adequate foundation for defendant to testify concerning her knowledge of Brown's reputation for violence, we do not find that a reasonable probability exists that the outcome of the trial would have been different if this reputation

evidence had been admitted. As discussed *infra*, defendant's testimony established that, prior to the stabbing, Brown had merely poked her, grabbed her by the shirt, gritted his teeth, and threatened her. See *infra* ¶ 83. Even if defendant had been permitted to testify that Brown had a reputation for violence, there is no reasonable probability the jury would have found that she reasonably believed Brown posed an imminent threat of death or great bodily harm to her at the time she stabbed him. See *infra* ¶ 83.

¶ 75        2. *Defendant's Statement She was "Quick with a Knife"*

¶ 76        Defendant argues that the trial court erred in ruling on her motions *in limine*, finding her statement that she was "quick with a knife," which she made while officers were investigating an unrelated domestic incident between her and her former girlfriend, was admissible at trial regardless of whether she presented evidence of Brown's violent character. Defendant contends that this statement was character evidence, and it was inadmissible because defendant did not put her character at issue. "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 77        Evidence of a person's character or character trait is generally inadmissible to prove that he or she acted in conformity therewith on a particular occasion. Ill. R. Evid. 404(a) (eff. Jan. 1, 2011); see also *People v. Lucas*, 151 Ill. 2d 461, 483 (1992) ("Generally, character evidence is inadmissible when a party's character is not in issue."). In a criminal case, the defendant may offer evidence of his or her own character trait, and the prosecution may offer character evidence in rebuttal. Ill. R. Evid. 404(a). However, "[t]he prosecution may not present evidence of a defendant's bad character until the defendant puts his character in issue by

presenting evidence of good character." *Lucas*, 151 Ill. 2d at 483-44; see also Ill. R. Evid. 404(a) (eff. Jan. 1, 2011).

¶ 78　　　　When a theory of self-defense is raised in a homicide case, the prosecution may introduce evidence of the defendant's violent character to show that the defendant was the initial aggressor "only if the defendant first opens the door by introducing evidence of good character to show that he is a quiet and peaceful person." *People v. Randle*, 147 Ill. App. 3d 621, 625 (1986). See also *People v. Harris*, 224 Ill. App. 3d 649, 653 (1992). While such evidence is relevant as circumstantial evidence to show that the defendant was the initial aggressor, it is inadmissible unless the defendant introduces evidence of his or her peaceful character because "the danger of unfair prejudice to the defendant in being portrayed as a 'bad man' substantially outweighs the probative value of the evidence." *Randle*, 147 Ill. App. 3d at 625.

¶ 79　　　　Here, Keil's testimony that defendant stated that she was "quick with a knife" when he spoke to her about an unrelated incident was character evidence. It was not evidence of a specific prior bad act but rather was evidence that defendant was either quick to use a knife in general or possessed the ability to handle a knife in a quick manner. Neither of these possible interpretations of defendant's statement results in the conclusion she was describing a specific bad act. Instead, defendant's statement she was "quick with a knife" refers to a general trait or ability. Defendant had not introduced any evidence concerning her peaceful character. Accordingly, the probative value of the statement was substantially outweighed by the danger of unfair prejudice to defendant, and we find that admission of the statement was error. See *id.*

¶ 80　　　　We reject the State's argument that defendant's statement that she was "quick with a knife" was properly admitted under the then-existing mental condition exception to the hearsay rule. See Ill. R. Evid. 803(3) (eff. Sept. 28, 2018). The problem with the statement was

- 28 -

not that it was hearsay. The statement was not hearsay at all, as it was a statement of a party-opponent. See Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015). The problem with the statement is that it served as improper character evidence to show that defendant acted in conformity with her trait of being quick to use a knife.

¶ 81 Having found that this statement was improperly admitted, we consider whether the admission of the statement amounted to harmless error. "An evidentiary error is harmless if there is no reasonable probability that the jury would have acquitted the defendant absent the error." *People v. Wesley*, 2019 IL App (1st) 170442, ¶ 27; see also *In re E.H.*, 224 Ill. 2d 172, 180 (2006).

¶ 82 The only aspect of the first degree murder charge that was in dispute at the trial was whether defendant was justified in stabbing Brown. Section 7-1(a) of the Criminal Code of 2012 (720 ILCS 5/7-1(a) (West 2018)) provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

Thus, to establish that the use of force was justified, a defendant must prove: (1) force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the defendant actually and subjectively believed a danger existed that required the use of the force applied, and (6) the defendant's

beliefs were objectively reasonable. *People v. Washington*, 2012 IL 110283, ¶ 35. "The long-standing rule is that mere threats of personal injury or death do not justify taking the life of the person making the threats when he is doing nothing to put them into execution." *People v. Felella*, 131 Ill. 2d 525, 534 (1989).

¶ 83    In the instant case, we find there is no reasonable probability that defendant would have been acquitted if her statement that she was "quick with a knife" had not been admitted because the evidence did not show that defendant was justified in stabbing Brown. We note that James testified he did not hear Brown make any threats to defendant prior to the stabbing, did not see Brown point a finger at defendant's face, and did not see Brown touch defendant's head. However, even defendant's testimony did not establish that she was justified in using deadly force against Brown.

¶ 84    Defendant testified that Brown had been threatening to beat her or have someone else do it for months prior to the incident, but he had never physically harmed her. Defendant testified that, on the night of the incident, Brown threatened to beat her, tapped her head with his finger in the shape of a gun, grabbed her by the shirt, gritted his teeth at her, and told her he was going to "f*** [her] up." However, as the State points out, defendant told the police during her interview shortly after the incident that the only physical contact Brown made with her was poking her in the face with his finger. Furthermore, even if we accept the additional details in defendant's trial testimony as credible, her testimony failed to establish a reasonable belief that death or great bodily harm was imminent such that she was justified in using deadly force against Brown. It simply was not reasonable for defendant to believe that Brown merely poking her with his finger, grabbing her by the shirt, and threatening to harm her posed an imminent threat of death or great bodily harm.

¶ 85                    B. Trial Court's Comments About Defense Counsel

¶ 86           Defendant next argues that she was denied a fair and impartial trial where the trial

court's comments and allegedly inconsistent treatment of the defendant and the prosecution

demonstrated hostility toward and disparagement of defense counsel. Defendant also contends

that the court made rulings that inconsistently favored the State or which were made in such a

way as to project favoritism.

¶ 87           "Illinois courts have long upheld the right of an accused to a fair and impartial

trial by jury, 'free from influence or intimation by the trial court.' " *People v. Mitchell*, 228 Ill.

App. 3d 167, 169 (1992) (quoting *People v. Sprinkle*, 27 Ill. 2d 398, 402 (1963)). "[A] trial judge

must refrain from interjecting opinions, comments or insinuations reflecting bias toward or

against any party." *People v. Sims*, 192 Ill. 2d 592, 636 (2000); see also *People v. Johnson*, 2012

IL App (1st) 091730, ¶ 76 ("It is well established that, because of the trial judge's great influence

over the jury, the judge must take care to avoid displaying any unnecessary display of

antagonism or favor toward any party."). "While the judge has wide discretion in the conduct of

trial, the judge may not make comments that would reveal his opinion as to the credibility of a

witness or the arguments of counsel." *Id.*; see also *People v. Evans*, 2017 IL App (1st) 150091,

¶ 25 ("What a trial court may not do is assume the role of an advocate.").

¶ 88           "Judicial comments can amount to reversible error if the defendant can establish

that such comments were 'a material factor in the conviction or were such that an effect on the

jury's verdict was the probable result.' " *People v. Burrows*, 148 Ill. 2d 196, 250 (1992) (quoting

*People v. Harris*, 123 Ill. 2d 113, 137 (1988)).

¶ 89           Here, defendant has identified numerous instances throughout the trial in which

she claims the trial court made disparaging or hostile comments toward defense counsel. We find

that the comments identified by defendant were not disparaging or hostile and that they did not, individually or collectively, constitute a material factor in defendant's conviction or have a probable effect on the jury's verdict. We will attempt to address each particular instance identified by defendant.

¶ 90                                    1. *Speaking Objections*

¶ 91        Defendant argues that the trial court showed hostility toward and disparagement of defense counsel when it repeatedly accused counsel of making "speaking objections" during the trial. Defendant notes that on one occasion during James's testimony, the court accused defense counsel of making a "speaking objection" when defense counsel was merely attempting to respond to a question posed by the court. Defendant contends that the court's admonishments about "speaking objections" were rendered even more egregious because the court did not make such admonishments to the State when it described legal concepts in making objections.

¶ 92        Defendant relies on *People v. Lewerenz*, 24 Ill. 2d 295 (1962), in support of his position. In *Lewerenz*, the court found that prejudicial error occurred when the trial court characterized normal and brief objections of defense counsel as "speeches." *Id.* at 300-01. The *Lewerenz* court found that the trial court's characterization of defense counsel's objections as "speeches" was not justified and conveyed a hostile attitude toward the defense. *Id.* at 301.

¶ 93        In *Lewerenz*, the trial court's characterization of defense counsel's objections as "speeches" expressed the court's negative opinion concerning the form of the objections. In the instant case, however, the trial court, referring to defense counsel's objections as "speaking objections," was simply descriptive and did not convey a negative opinion. Here, the trial court's characterization of some of defense counsel's objections as "speaking objections" was not disparaging and did not convey hostility toward defense counsel.

¶ 94      While the trial court often removed the jury from the courtroom to address the "speaking objections," the court explained to the jury early in the trial that this was the court's rule, and the jurors should not get upset with the attorneys when they had to leave the courtroom. The fact that the court advised the jury that this was the court's rule lessened the risk of the jurors faulting defense counsel when they had to leave the courtroom so that his objections could be addressed.

¶ 95                                    2. *Cross-Examination of Roth*

¶ 96      Defendant argues that the trial court also showed hostility toward defense counsel during counsel's cross-examination of Roth when defense counsel confronted Roth with his grand jury testimony. Defendant notes the court (1) refused defense counsel's request to approach Roth to provide him with a copy of his grand jury testimony, (2) responded to an objection by the State by saying that defense counsel had engaged in an "improper method of attempt at impeachment," and (3) instructed defense counsel in front of the jury as to how he should impeach the witness, going through an "imaginary colloquy" to demonstrate how to properly impeach the witness.

¶ 97      We find nothing improper or disparaging about any of the identified remarks by the trial court and further find they did not constitute a material factor in defendant's conviction or have a probable effect on the jury's verdict.

¶ 98                                    3. *Roth's Attempt to Identify Defendant*

¶ 99      Defendant argues that the trial court showed favoritism toward the prosecution when one of defendant's attorneys, Joseph Moran, attempted to establish for the record that Roth had identified his co-counsel, Wilson, as defendant. Defendant contends that the trial court told Moran not to interrupt the State, said that the record would not reflect the identification, and gave

the State a second chance to have Roth identify defendant. Defendant argues that giving the State and Roth a second chance to identify Jackson served to undermine defense counsel and to bolster the reputations of Roth and the State in the eyes of the jury.

¶ 100     We disagree with defendant that the trial court gave the State and Roth a second chance to identify defendant. When defense counsel asked for the record to reflect that Roth had identified Wilson, the State was in the process of asking a follow-up question to try to ascertain whether Roth had identified defendant or Wilson. The court explained that there were similar characteristics between defendant and Wilson and that it would allow the State to ask its follow-up question to ascertain which woman Roth had identified. Once it was clear that Roth had identified Wilson rather than defendant, the court let the record reflect that identification. We do not find that this exchange involved a showing of favoritism toward the State.

¶ 101                    4. *Comment on the Nature of the Evidence*

¶ 102     Defendant contends that the trial court improperly commented on the nature of the evidence while defense counsel was questioning defendant when it said that "the evidence, unrefuted, [was] that [defendant] did go inside the house." Defendant contends that the court's comments constituted an improper characterization of the evidence, especially since the question of whether defendant went into the house before or after the altercation with Brown became a contested issue.

¶ 103     We disagree with defendant's interpretation of the court's comments. When read in context, the court was conveying it did not understand defense counsel's line of inquiry. The court's comment that the "unrefuted" evidence was that defendant went inside the house was referencing the fact that both James and defendant testified that defendant went into the house after the incident. The court was asking defense counsel whether she was referring to when

defendant actually went into the house after the altercation or asking why defendant did not do so earlier. Defense counsel rephrased her question to clarify that she was asking why defendant did not go into the house before the altercation with Brown. The court's comments do not suggest that it believed the evidence had established that defendant went into the house before the altercation with Brown, as James testified occurred.

¶ 104                    5. *Providing the State With a Basis for an Objection*

¶ 105          Defendant contends that the trial court unfairly favored the prosecution when it provided the prosecution with a basis on which it would sustain the prosecution's objection. Defendant notes that after defendant testified that she did not think she could have protected herself against defendant, the State objected on the basis of relevance. The trial court stated that the objection on the basis of relevance was overruled, but an objection on the ground of asked and answered would be sustained. The State then objected on the ground that the question had been asked and answered, and the court sustained the objection.

¶ 106          Defendant argues that, similar to *People v. Wiggins*, 2015 IL App (1st) 133033, the trial court acted on behalf of the State by giving the State a basis on which it would sustain the objection. In *Wiggins*, the court held that the trial court interposing objections on behalf of the State and acting as an advocate for the State in other ways deprived the defendant of a fair trial. *Id.* ¶ 53.

¶ 107          Here, unlike in *Wiggins*, the trial court did not *sua sponte* interpose objections on behalf of the State. Rather, the court, in ruling on an objection made, expressed that it would sustain the State's objection on a different ground than the one raised by the State. When viewing the trial court's actions in the context of the whole trial, we do not find that the trial court abandoned its role as a neutral arbiter and showed unfair favoritism toward the prosecution.

¶ 108                    C. Impeachment with Postarrest Silence

¶ 109         Defendant argues that the State denied her a fair trial and violated her right to

silence by commenting on and cross-examining her about her postarrest silence. Specifically,

defendant contends that the State improperly questioned her concerning why she failed to convey

certain details from her trial testimony to the police in the two years between her prearrest

interview and the trial.

¶ 110         "[U]nder Illinois evidentiary law, it is impermissible to impeach a defendant with

his or her postarrest silence, regardless of whether the silence occurred before or after the

defendant was given *Miranda* warnings." *People v. Clark*, 335 Ill. App. 3d 758, 763 (2002). This

is because a defendant's postarrest silence is neither relevant nor material to the issue being tried.

*People v. Quinonez*, 2011 IL App (1st) 092333, ¶ 27. There are two exceptions to this general

rule in which a defendant's postarrest silence is considered relevant. *Id.* "[A] defendant's

postarrest silence may be used to impeach his trial testimony: (1) when defendant testifies at trial

that he made an exculpatory statement to the police at the time of his arrest; and (2) when he

makes a postarrest statement that is inconsistent with his exculpatory trial testimony." *Id.*

¶ 111         In the instant case, defendant was not improperly impeached with postarrest

silence. While defendant contends that she was not under arrest at the time of her interview at the

police station, she was subject to custodial interrogation at that time. See 725 ILCS 5/102-5

(West 2018) (" 'Arrest' means the taking of a person into custody."). Thus, defendant was not

silent after she was taken into custody; she gave a lengthy statement to the police.

¶ 112         Moreover, we find that the challenged questions posed by the State on

cross-examination constituted proper impeachment concerning the inconsistencies between

defendant's interview by the police and her trial testimony. Defendant stated during

cross-examination that she did not tell the officers at the time of her interview that Brown grabbed her by the shirt, gritted his teeth at her, and said he was going to "f*** [her] up" because she was in shock at the time. The prosecutor proceeded to ask follow-up questions concerning this response, including asking whether defendant was in shock for the entire two years between her interview and the trial and whether she attempted to tell anyone during that time that the incident with Brown was "categorically different" than the account she initially gave to the officers. These follow-up questions did not improperly impeach defendant with her postarrest silence but rather properly challenged defendant's explanation for the inconsistencies between her statements to the police and her trial testimony.

¶ 113    Even if we were to accept defendant's argument that the State improperly impeached her with her postarrest silence when it asked questions concerning the fact that she had failed to tell anyone between the time of her interview with the police and the trial that Brown grabbed her by the shirt and gritted his teeth at her during the incident, any error would be considered harmless. Defendant concedes that her credibility concerning these statements was challenged through proper impeachment when the State confronted her with the fact that she omitted these details from her interview with the police. There is no reasonable probability that the State's allegedly improper questions concerning defendant's failure to attempt to tell anyone the omitted details after she was taken into custody impacted defendant's credibility as to these statements enough to change the outcome of the trial.

¶ 114                                D. Cumulative Error

¶ 115    Defendant argues that the errors she has identified cumulatively created a pervasive pattern of unfair prejudice and resulted in a trial that was fundamentally unfair. Defendant contends that a new trial is warranted on the basis of cumulative error. "[W]hile

individual trial errors may not require a reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial." *People v. Speight*, 153 Ill. 2d 365, 376 (1992).

¶ 116　　　　We have found that defendant forfeited her claim that the trial court erred in ruling on her motions *in limine* that the State would be permitted to introduce evidence of her prior act of violence if she introduced evidence of Brown's character for violence. We also found that the trial court's allegedly hostile and disparaging remarks and the State's alleged improper impeachment of defendant with her postarrest silence did not constitute error. We have identified a single error—namely, the admission of defendant's statement that she was "quick with a knife." As we previously discussed, this error was harmless. Accordingly, defendant is not entitled to a new trial on the basis of cumulative error.

¶ 117　　　　　　　　　　　　　III. CONCLUSION

¶ 118　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 119　　　　Affirmed.