NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250337-U

NO. 4-25-0337

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 24, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| CHARLOTTE ORTEGA, | ) | No. 23CM2462 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Tamika R. Walker, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding (1) the evidence was sufficient for a jury to reasonably conclude defendant was guilty beyond a reasonable doubt of battery, (2) defendant forfeited her claim the trial court erred when excluding evidence of the victim's aggressive and violent character, and (3) the court's restitution order was appropriate.

¶ 2    Defendant, Charlotte Ortega, was convicted by a jury of battery (720 ILCS 5/12-3(a)(2) (West 2022)). She was subsequently sentenced to 18 months' conditional discharge and ordered to pay $1,808 in restitution for an ambulance bill. On appeal, she argues (1) the State failed to prove her guilty beyond a reasonable doubt, (2) the trial court abused its discretion when it excluded evidence of the victim's aggressive and violent character, and (3) the court erred when ordering her to bear the entire burden of restitution. We disagree and affirm.

¶ 3                             I. BACKGROUND

¶ 4    In December 2023, defendant was charged by complaint with battery (*id.*) for

knowingly making physical contact of an insulting or provoking nature with Laura Morales when she repeatedly struck Morales on her head and body.

¶ 5        In June 2024, prior to trial, defendant filed a motion asserting the affirmative defense of self-defense pursuant to section 7-1 of the Criminal Code of 2012 (720 ILCS 5/7-1 (West 2022)). Defendant also filed a supplemental motion for discovery requesting the State produce and disclose evidence of Morales's prior acts of violence pursuant to (1) defendant's claim of self-defense, (2) *People v. Lynch*, 104 Ill. 2d 194 (1984), and (3) *People v. Gossett*, 115 Ill. App. 3d 655 (1983).

¶ 6        The matter proceeded to a jury trial in November 2024. The following exchange occurred between the trial court and the parties:

"THE COURT: All right. Are there any prior conduct motions by the defense? Like *Gossett-Lynch* issues or anything like that.

MS. GALLAGHER [(DEFENDANT'S ATTORNEY)]: Judge, I have filed *Gossett-Lynch*. I have received all *Gossett-Lynch* material.

THE COURT: All right. [Are] there any motions that we need to take up regarding that issue?

MS. GALLAGHER: Judge, I don't believe there would be a motion, necessarily. But from the *Gossett-Lynch* that I received from the State, I believe we would intend to use some of the *Gossett-Lynch* material that was tendered.

THE COURT: And have you provided notice of that to the

State?

MR. CHREST [(STATE'S ATTORNEY)]: They have not, Your Honor.

MS. GALLAGHER: No.

THE COURT: All right.

MS. GALLAGHER: This is a misdemeanor, Your Honor.

THE COURT: I understand. I just don't want there to be trial by surprise here, so I just want to make sure everybody is on notice as to what each party intends to present."

¶ 7　　At trial, Laura Morales testified on behalf of the State. Morales said that, on December 10, 2023, she was at the Tollway Inn, a motel in South Beloit, Illinois, with a man she met through social media. She observed a car full of women outside her motel room. Shortly thereafter, she heard knocking at her door. She said she was not sure what to do, so she waited "20 minutes" before eventually opening the door. She recalled several women at the door who immediately came inside her room. In total, she said there were five women. She identified defendant as the lead woman who had entered her room. Morales claimed she knew defendant because defendant had been having an affair with her husband for six years. When she opened the door, she said defendant, who had a phone in her hand, "came at" her and began punching her in the face, kicking her body, and grabbing her hair. She said defendant "just attacked" her. She stated she was unable to defend herself because there were too many women hitting her. She recalled being hit "50 times" by defendant alone. Morales's injuries included bleeding from her mouth and nose.

¶ 8　　Without objection, the trial court admitted a video from a security camera at the

Tollway Inn, which showed the altercation involving defendant and Morales. The video was relatively high quality; however, the distance from the camera to the motel room door made identifying specific events difficult at times. The video published to the jury began at time stamp 4:00. The video showed the motel parking lot and several motel room doors. On the right side of the video, three women are seen standing outside a motel room door. In the parking lot, a black sedan was parked outside the motel room, and two parking spaces to the left, there was a red sedan. At time stamp 4:14, one of the women left the view of the camera. At time stamp 4:57, a different woman arrived in front of the motel room. At time stamp 5:05, a person wearing a white shirt, later identified as Morales, opened the motel room door. There appeared to be a struggle and a brightly lit object, which appeared to be a cellular phone, was moving up and down. The women subsequently began entering the motel room. The woman who had left at time stamp 4:14 reemerged and also entered the motel room. In all, four women entered the room. Nothing that could have occurred in the room can be observed from the video. At time stamp 5:34, a fifth woman arrived and subsequently entered the room. At time stamp 5:50, the headlights on the red sedan began flashing. At time stamp 6:00, a struggle occurred in the doorway of the room, but it is unclear who participated. At time stamp 6:34, some individuals left the room. At time stamp 6:54, Morales, who was wearing a white coat and dark pants, left the room and walked into the parking lot, where she was struck repeatedly by a woman wearing an all-black outfit. At time stamp 6:58, a different woman, wearing a lighter shirt and shorts and carrying some type of clothing, struck Morales repeatedly. At timestamp 7:02, defendant, who was wearing dark pants and a sweatshirt, grabbed Morales by her hair and pulled her as all three women struck Morales. Eventually Morales escaped from defendant and moved around as defendant and another woman followed her throughout the parking lot. At time stamp 7:50,

defendant grabbed Morales again while two other women struck Morales repeatedly. The video was stopped at time stamp 8:09.

¶ 9    On cross-examination, Morales confirmed she waited 20 minutes, "maybe a little less," before answering the motel room door after hearing a knock. The motel's security camera video was published to the jury, again showing the elapsed time from the beginning of the video until time stamp 5:05, when Morales opened the motel room door. Morales conceded only five minutes could have passed until she opened the door. The video was played until time stamp 9:06, during which the altercation between Morales and several of the women continued. Morales denied trying to grab defendant's phone from her hand when she opened the motel room door. Morales said she knew defendant was having an affair with her husband for the past six years. She said defendant told her she was having an affair with her husband in 2021. She denied ever speaking with defendant prior to December 10, 2023. She also denied telling police officers who responded to the incident on December 10, 2023, that she had spoken with defendant prior to that evening. Morales denied she was at the motel cheating on her husband and confirmed she was there meeting with a man to get information about defendant.

¶ 10    On redirect examination, Morales described feeling scared when she heard someone knock on the door to the motel room and was not focused on the time or how many minutes had passed before opening the door. She also said the first person to "hit" her that evening was defendant, after she opened the door.

¶ 11    Police officer Amanda West testified she was dispatched to the Tollway Inn on December 10, 2023. West observed blood around Morales's mouth and nose. She did not observe any injuries to defendant. Defendant told West she had gone to the motel because she saw Morales's vehicle in the parking lot and knew Morales was cheating on her husband.

¶ 12          On cross-examination, West confirmed defendant told her she had knocked on the door to speak with Morales and was recording with her phone. Defendant then told West that Morales "started, like, throwing hands" and "hit the pregnant [woman]." West confirmed defendant explained how Morales started the fight. West agreed the story she received from Morales at the time of the incident "didn't make any sense." West told Morales, " 'I don't believe you.' " West's body-worn camera footage from the night of the incident was published to the jury. The video was later admitted into evidence without objection and was consistent with West's testimony. On redirect examination, West confirmed the motel security camera video showed defendant had hit Morales.

¶ 13          The State rested. Defendant moved for a directed verdict, which the trial court denied.

¶ 14          Defendant testified on her own behalf. Defendant observed Morales's vehicle in the parking lot and called Morales's husband. She said she had met Morales prior to the night of the incident. When asked what her interactions with Morales were, the State objected as to relevance. A sidebar between the trial court and the parties occurred. There is no transcript of the sidebar, but a bystander's report indicates defense counsel argued defendant's answer would explain how she knew Morales and whether Morales knew defendant, even though Morales had previously testified to not knowing who defendant was. The court overruled the State's objection but instructed "counsels that we're going to limit questions to go beyond December 10th of 2023." Defendant testified she entered the motel parking lot and took photographs of Morales, some of which were admitted into evidence without objection. The security camera video from the motel was published to the jury again and narrated by defendant. Defendant stated when Morales opened the door, she grabbed for defendant's phone, which caused a struggle.

Defendant and two of the other women then moved into the room. Once inside the room, defendant said she was speaking with the unidentified male, who was in the room with Morales, and the other women were only arguing with Morales. Defendant said Morales "attack[ed]" her by trying to "snatch" her phone. Defendant said she left the motel room with the male and they were talking outside in the parking lot. She recalled Morales left the room with the other women and they were fighting. She said the fight started because Morales hit the pregnant woman. Defendant stated Morales insisted on talking to her and that she tried to walk away and avoid Morales, but "[s]he kept coming towards me." When asked if she ever "touch[ed]" Morales, defendant said she "shove[d] her off of [her] a few times as she came at [her]." When asked why she touched Morales, defendant said it was because Morales kept shoving her.

¶ 15    On cross-examination, defendant denied any physical violence occurred in the motel room. On redirect examination, defendant indicated she was afraid of Morales when "[Morales] was coming after [her]." She denied initiating contact of any kind with Morales and said the only physical contact she made with Morales "was to push her away" after Morales attacked her. When asked how she knew it was Morales's vehicle in the parking lot, defendant said the vehicle "almost hit [her] in Capron as [Morales] was following." The State interrupted and objected as to relevance. The trial court sustained the objection and instructed the jury to disregard defendant's last statement. A sidebar between the court and the parties occurred, wherein no transcript of the discussion was recorded. A bystander's report indicates defense counsel contended the answer was relevant to defendant's self-defense argument and noted a *Gossett-Lynch* application of prior interactions and bad acts by Morales against defendant. Following the sidebar, the court reiterated it was sustaining the objection. Defendant reiterated she never made physical contact with Morales first and that Morales was the aggressor.

¶ 16          Defendant rested.

¶ 17          The jury found defendant guilty of battery.

¶ 18          On November 22, 2024, defendant filed a motion for new trial arguing, *inter alia*, (1) the State improperly argued a theory of accountability during rebuttal closing arguments and (2) the trial court erred when it prevented defendant from presenting evidence of Morales's prior bad acts. The specific evidence defendant sought to introduce was that (1) Morales had followed defendant a week prior to the incident and caused her car to go into a ditch and (2) Morales's husband had reported her for domestic violence. Following a hearing, the court denied defendant's motion. The court found the State did not attempt to argue a theory of accountability but mentioned the word "accomplice" once during closing arguments. Additionally, the court noted the jury was instructed that closing arguments were not to be considered as evidence. Regarding the prior bad acts, the court found the incidents referenced by defendant were not convictions, nor did they constitute criminal activity. The court described the acts as "ancillary issues," which were irrelevant and "more prejudicial than probative."

¶ 19          The matter proceeded to a sentencing hearing on January 13, 2025. The trial court summarized the evidence at trial as follows:

> "But not only did you call your people there, they show up
> and then we have this big melee at this hotel. All of this was
> preventable. All of this was unnecessary. And the video shows the
> knock on the door, the open of the door, the raise of your hand, and
> the going down of your hand in what appears to be a battery, and
> that's what the jury found. I understand you all disagree with that,
> and you are perfectly within your rights to disagree with that, but

- 8 -

that's really what the evidence shows. The question is: Did Ms.

Morales hit you first; did you hit her first? The jury found that you

were the aggressor."

¶ 20        The trial court sentenced defendant to 18 months of conditional discharge. Additionally, the court ordered her to complete anger management, have no contact with Morales, and pay restitution of $1,808. A bill from the South Beloit Fire Department was submitted as evidence showing Morales was charged $1,808 for emergency services on December 11, 2023.

¶ 21        On February 12, 2025, defendant filed a motion to reconsider sentence, arguing, *inter alia*, she alone had been ordered to pay restitution to Morales, despite her injuries having been caused by the other codefendants. The trial court noted defendant had been convicted of battery and there was no contention from the State the incident was predicated under the theories of conspiracy or accountability. The court also noted her codefendants chose not to go to trial and the benefit of their bargains was that no restitution was ordered. The court said it did not have the authority to reopen their individual cases to distribute the restitution costs among them individually. The court stated defendant chose to go to trial, was convicted, and the court was required to impose sentence. The court said it was "not holding [defendant] specifically accountable for what someone else did or [the other codefendants] accountable for what [defendant] did." As part of the sentencing hearing, the court noted the State had provided evidence of an ambulance that arrived to treat Morales as a result of the battery. The court concluded it imposed restitution correctly and denied defendant's motion.

¶ 22        This appeal followed.

¶ 23                                II. ANALYSIS

¶ 24        On appeal, defendant argues (1) the State failed to prove her guilty of battery beyond a reasonable doubt, (2) the trial court abused its discretion when it excluded evidence of Morales's character, and (3) the court erred when ordering her to bear the entire burden of restitution. We address each claim in turn.

¶ 25                      A. Sufficiency-of-the-Evidence Claim

¶ 26        When examining the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess the witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 27        For battery, the State had to prove (1) defendant knowingly made physical contact of an insulting or provoking nature with Morales and (2) defendant was not justified in using the force which she used. 720 ILCS 5/12-3(a)(2) (West 2022). "An individual acts with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26; see 720 ILCS 5/4-5(b) (West 2022). A defendant's mental state is rarely proven by direct evidence and, as such, is generally inferred from the character of the defendant's acts and from the circumstances surrounding the commission of the offense. *People v. Eubanks*, 2019 IL 123525, ¶ 74. "[T]he trier of fact is in the best position to determine whether a particular mental state is present." *People v. Pollard*, 2015

IL App (3d) 130467, ¶ 27.

¶ 28    Defendant's first contention is the security video provided reasonable doubt of her guilt. Initially, she argues this court is not required to afford deference to the jury's factual findings and may independently review the video evidence at issue. She cites *People v. Dixon*, 2015 IL App (1st) 133303, ¶ 20, *People v. Radojcic*, 2013 IL 114197, ¶ 34, and *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 26, in support.

¶ 29    *Dixon* involved a bench trial where the defendant was convicted of armed robbery. *Dixon*, 2015 IL App (1st) 133303, ¶ 1. The appellate court in that case stated, "A trial court's findings based on testimonial evidence are entitled to great deference, but its findings based on nontestimonial evidence (exhibits, like surveillance videos, admitted into evidence) are not entitled to any deference." *Id.* ¶ 20. *Dixon* cited *Radojcic* and *Shaw* for this proposition. We note *Shaw* also involved a bench trial, and the appellate court in that case reversed a conviction, finding surveillance video evidence contradicted the victim's testimony. *Shaw*, 2015 IL App (1st) 123157, ¶ 1. In *Shaw*, however, the issue of the standard of review for testimonial versus video evidence did not arise; rather, the appellate court reversed, finding the trial court's factual findings were against the manifest weight of the evidence. *Id.* ¶ 26. *Radojcic* involved the crime-fraud exception to attorney-client privilege where the State sought to compel the defendant's attorney to testify as to communications with defendant, who was his former client. *Radojcic*, 2013 IL 11419, ¶ 1. In *Radojcic*, our supreme court said:

> "Although a trial court's factual findings are accorded deference on review and will only be reversed if they are against the manifest weight of the evidence, that deference 'is grounded in the reality that the circuit court is in a superior position to

determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in the testimony.' [Citation]. Here, however, the State offered no live testimony, only transcripts from the grand jury proceedings. Thus, the trial court did not occupy a position superior to the appellate court or this court in evaluating the evidence offered by the State in support of the crime-fraud exception." *Id.* ¶ 34.

¶ 30 We find *Radojcic* distinguishable. First, it involved appellate review of a case where the trial court was the fact finder. This case involved a jury trial, which is a uniquely cherished and fundamental right of all defendants. See *Duncan v. State of Louisiana*, 391 U.S. 145, 149-58 (1968). Secondly, *Radojcic* did not involve any live testimony, whereas the present case involved live testimony, along with other forms of evidence. Accordingly, we decline defendant's invitation to review the video evidence independently from the entirety of the evidence submitted at trial. Further, we will not review the evidence with any less deference than the standard we explained above. *Supra* ¶ 26.

¶ 31 Regarding the video evidence, defendant argues it showed Morales opened the door and attempted to wrestle defendant's phone away from her. Defendant had her phone above her head and brought her hand—which was holding the phone—down to prevent Morales from taking it away. She also contends the video contradicts Morales's testimony, specifically, that defendant "came at" Morales and that defendant alone struck Morales more than 50 times.

¶ 32 Defendant also contends the video contradicts the State's argument during closing argument that defendant threw the first punch when Morales opened the door. She notes West's written factual summary within the record contends a male grabbed defendant's phone after the

motel room door opened. Finally, she argues the video contradicts the trial court's synopsis of the evidence it expressed at sentencing that defendant struck Morales upon opening the door.

¶ 33 Regarding Morales's testimony, defendant contends it was both improbable and contained numerous inconsistencies and could not support the jury's verdict. For example, she notes Morales's explanation for why she was at the motel room was both unbelievable and contradicted by the video. Morales's testimony was impeached, such as how long she waited to open the motel room door, how long defendant's alleged affair with her husband had lasted, and the number of times Morales claimed defendant alone struck her.

¶ 34 Defendant also argues the State failed to show she knowingly made contact of an insulting and provoking nature with Morales. She notes the video and her testimony showed she was trying to remove her phone and arm from Morales's grasp after Morales opened the door. She also contends the video showed Morales as the one initiating contact and defendant continually backing away from her.

¶ 35 The State argues the evidence was sufficient to support the jury's verdict and several of defendant's arguments should be disregarded because they were not evidence considered by the jury, such as the State's closing argument, West's written factual summary, and the trial court's synopsis of the evidence from the sentencing hearing. We agree.

¶ 36 West's written factual summary was never reviewed by the jury, and the trial court's interpretation of the jury's findings was articulated at the sentencing hearing well after the jury trial concluded. The State did argue in closing that the battery occurred when defendant punched Morales as she opened the motel room door, but the jury was admonished by the court just prior to the State's closing argument and in the jury instructions that closing arguments are not evidence. Accordingly, we will not address these contentions because defendant provides no

basis to believe they were considered by the jury during its deliberations. See *People v. Illgen*, 145 Ill. 2d 353, 376 (1991) ("Faith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system.").

¶ 37        Regarding the remainder of defendant's voluminous contentions, the jury was tasked with weighing all of the evidence at trial. Whether the battery occurred when Morales opened the door is not within the purview of this court. "It is not the function of the reviewing court to retry the defendant." *People v. Jackson*, 2020 IL 124112, ¶ 64. The video is not clear enough to precisely determine what kind of physical contact occurred between defendant and Morales when she opened the door. This meant the testimony of the witnesses was indispensable when determining what occurred. "[T]he appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). Furthermore, the jury was capable of determining the battery could have occurred at any of the several other instances defendant can clearly be seen on video striking Morales.

¶ 38        The evidence shows defendant arrived at Morales's motel room uninvited. Defendant initiated contact by knocking on the door. There was a scuffle when Morales opened the door. Defendant and several other women entered the motel room, where the confrontation continued until it spilled out into the parking lot. The video shows defendant and several other women grabbed and struck Morales numerous times. Morales testified defendant was the aggressor. Defendant testified Morales was the aggressor, she tried to evade Morales, and she only made contact with Morales in self-defense. The jury chose to believe Morales and found the State had proven beyond a reasonable doubt that defendant had knowingly made physical contact of an insulting or provoking nature with Morales and that she was not justified in doing so. It

was the jury's responsibility to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *Murray*, 2019 IL 123289, ¶ 19. After reviewing the evidence at trial, we find nothing so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of defendant's guilt. Therefore, we find a jury could reasonably and rationally conclude beyond a reasonable doubt that defendant unjustifiably and knowingly made physical contact of an insulting or provoking nature with Morales.

¶ 39        Lastly, defendant argues her conviction cannot be upheld under a theory of accountability. She contends the State was required to provide notice of its intention to pursue a theory of accountability at trial. She cites the State's use of the term "accomplices" during closing arguments.

¶ 40        We disagree. First, as we noted above, arguments are not evidence, and the jury was properly admonished regarding this point prior to closing arguments and deliberations. Second, the mere use of the term "accomplices" in this instance did not transform the State's case into a theory of accountability. The State maintained in its charging document and in the evidence presented at trial, that defendant, individually, knowingly and unjustifiably made physical contact of an insulting or provoking nature with Morales. We have already determined the evidence was sufficient for a jury to find defendant guilty of battery beyond a reasonable doubt.

¶ 41                        B. Excluded-Evidence Claim

¶ 42        Defendant next contends the trial court abused its discretion when it excluded evidence showing Morales's aggressive and violent character. She argues under *Lynch* that her

- 15 -

knowledge of Morales's attempt to run her over with a vehicle affected her perceptions and reactions to Morales's behavior. Specifically, it affected her reaction to push Morales away during their altercation in the parking lot. She also argues it was relevant to support her version of events where she and Morales provided conflicting accounts of what occurred on the night of the incident.

¶ 43        Evidence of a victim's aggressive and violent character may be relevant to support a theory of self-defense. *Lynch*, 104 Ill. 2d at 199-200. One basis under *Lynch* is to show "the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior." *Id.* at 200. Under this basis, "the evidence is relevant to show the defendant's state of mind—that [the] defendant acted reasonably in acting in self-defense." *People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 28. A second basis under *Lynch* is "to support the defendant's version of the facts where there are conflicting accounts of what happened." *Lynch*, Ill. 2d at 200. "In other words, the evidence is relevant to support the defendant's claim that the victim was the aggressor." *Yeoman*, 2016 IL App (3d) 140324, ¶ 29.

¶ 44        "The determination of whether evidence is relevant and admissible is in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion." *Id.* ¶ 27. "The threshold for finding an abuse of discretion *** is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court." *Id.*

¶ 45        The State argues the trial court did not abuse its discretion when excluding the evidence pursuant to *Lynch*. Additionally, the State contends defendant forfeited this argument by failing to make an offer of proof. See *People v. McMillan*, 239 Ill. App. 3d 467, 489 (1993)

("The failure to make an adequate offer of proof results in a waiver of the issue on appeal.").

¶ 46    "It is well settled that the key to preserving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court and a defendant's failure to make such an offer results in forfeiture of the issue." *People v. Staake*, 2017 IL 121755, ¶ 51. Our supreme court has previously explained an adequate offer of proof as follows:

> "Where an objection is sustained to the offered testimony of a witness, an adequate offer of proof is made if counsel makes known to the trial court, with particularity, the substance of the witness' anticipated answer. [Citation.] An offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate. [Citation.] Neither will the unsupported speculation of counsel as to what the witness would say suffice. [Citation.] Rather, in making the offer of proof, counsel must explicitly state what the excluded testimony would reveal and may not merely allude to what might be divulged by the testimony. [Citation.] The offer serves no purpose if it does not demonstrate, both to the trial court and to reviewing courts, the admissibility of the testimony which was foreclosed by the sustained objection." *People v. Andrews*, 146 Ill. 2d 413, 421 (1992).

¶ 47    Defendant concedes she did not make an offer of proof in either of her contentions that evidence was excluded. She argues, however, an offer of proof is only necessary where the record fails to show what the "instance is" that a defendant was trying to admit at trial. She cites *Lynch* in support.

¶ 48　　　　In *Lynch,* our supreme court held the trial court erred when it ruled the defendant could not present evidence of the victim's prior battery convictions as evidence of the victim's violent character to show the victim was the aggressor. *Lynch*, 104 Ill. 2d at 201-02. The *Lynch* court held no offer of proof was necessary in that case because there was "no question" that the battery convictions could have been proven, such that the only issue for the reviewing court to decide was the legal issue of whether the convictions were admissible. *Id.* at 202.

¶ 49　　　　We find the circumstances of this case distinguishable from *Lynch*. Defendant has made no assertion of any certified convictions in Morales's past or any other type of unquestionable evidence that was excluded by the trial court. Per the bystander's report, the evidence defendant sought to admit in the first instance was ambiguous and only offered to show that she and Morales knew each other prior to the night in question. The second instance involved an incident where Morales was purportedly following defendant and almost hit defendant with her vehicle.

¶ 50　　　　We agree with the State that defendant's excluded-evidence claims are forfeited. See *People v. Jackson*, 2022 IL App (4th) 200625-U, ¶ 72 (finding the defendant forfeited review of her excluded-evidence claim by failing to make an offer of proof); see also *Snowstar Corp. v. A&A Air Condition & Refrigeration Service, Inc.*, 2024 IL App (4th) 230757, ¶ 73 (finding the defendant forfeited a claim for failing to make an offer of proof either formally through witness testimony or informally through counsel with a detailed explanation of what the testimony would include). Moreover, even if we charitably considered defendant's sidebar with the trial court as an attempt at an informal offer of proof, the bystander's report of the purported testimony is unhelpful in the first instance and conclusory in the second instance. Thus, the offer of proof was entirely inadequate, thereby providing this court with no basis to conclude the trial

- 18 -

court's determination was arbitrary, fanciful, or unreasonable.

¶ 51                                    C. Restitution Claim

¶ 52          Finally, defendant contends the trial court erred when ordering her to solely pay

the entire restitution amount of $1,808 to Morales for an ambulance bill from the night of the

incident. She notes this case involved three other defendants who pleaded guilty in their

respective cases and were not ordered to pay any restitution to Morales. She argues that in cases

involving multiple defendants, section 5-5-6(c) of the Unified Code of Corrections (Corrections

Code) (730 ILCS 5/5-5-6(c) (West 2024)) requires the court to order each defendant to pay

restitution. She contends section 5-5-6(c)(2) (*id.* § 5-5-6(c)(2)) permits the court to apportion the

restitution amount based on culpability to each defendant where all the defendants have been

ordered to pay restitution. Because the other defendants related to this matter had not been

ordered to pay restitution to Morales, defendant argues the court's restitution order was

unauthorized by the Corrections Code. She requests we reverse that order.

¶ 53          The State does not contest that the Corrections Code requires the trial court—in

cases involving multiple defendants—to order each defendant to pay restitution. However, the

State argues the court, in this case, lacked the authority to order the other defendants to pay

restitution because their respective cases had already been closed per their individually

negotiated guilty pleas. The State contends the only error was the court's failure to order

restitution in the other defendants' respective cases, but that did not make it error for the court to

order restitution in this case. The State argues the court properly ordered defendant to pay

restitution in compliance with the Corrections Code.

¶ 54          The Corrections Code section at issue states:

              "In cases where more than one defendant is accountable for the

same criminal conduct that results in out-of-pocket expenses,

losses, damages, or injuries, each defendant shall be ordered to pay

restitution in the amount of the total actual out-of-pocket expenses,

losses, damages, or injuries to the victim proximately caused by

the conduct of all of the defendants who are legally accountable for

the offense." *Id.* § 5-5-6(c) (West 2024).

The section goes on to instruct the trial court to apportion the amount of restitution paid by each defendant proportionally based on individual culpability. *Id.* § 5-5-6(c)(2). Additionally, when no order exists apportioning the restitution, "each defendant shall bear his *pro rata* share of the restitution." *Id.* § 5-5-6(c)(3).

¶ 55 "The primary objective of statutory construction is to ascertain and give effect to the true intent of the legislature." *People v. Clark*, 2019 IL 122891, ¶ 18. "The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning." *Id.* ¶ 20. "Issues requiring statutory interpretation are questions of law subject to *de novo* review." *Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 27.

¶ 56 Initially, we must construe, as relevant to this case, the meaning of the statute, which states:

"In cases where more than one defendant is accountable for the

same criminal conduct that results in out-of-pocket expenses, ***

each defendant shall be ordered to pay restitution in the amount of

the actual out-of-pocket expenses *** to the victim proximately

caused by the conduct of all of the defendants who are legally

accountable for the offense." 730 ILCS 5/5-5-6(c) (West 2024).

Our first observation is the word "cases" is modified in such a way to restrict it to cases where there is both more than one defendant accountable for the same criminal conduct and the restitution at issue was also proximately caused by said conduct where all of the defendants are legally accountable for the offense. "A statute should be read as a whole and construed to give effect to every word, clause, and sentence; 'we must not read a statute so as to render any part superfluous or meaningless.' " *Village of Chatham v. Springfield Airport Authority*, 2025 IL App (4th) 241112, ¶ 19 (quoting *People ex rel. Illinois Department of Corrections v. Hawkins*, 2011 IL 110792, ¶ 23). Our second observation is the legislature requires each defendant to be ordered to pay the total amount of restitution. See *People v. Reed*, 177 Ill. 2d 389, 393 (1997) ("Legislative use of the word 'may' is generally regarded as indicating a permissive or directory reading, whereas use of the word 'shall' is generally considered to express a mandatory reading."). The legislature's decision to restrict cases involving more than one defendant, such that all of the defendants are accountable for the (singular) "offense" and each defendant must be ordered to pay the total restitution amount, is consistent with cases where two or more defendants are charged in the same charging instrument.

¶ 57     Defendant's interpretation would permit the restitution statute to apply to all cases involving more than one defendant, such as where defendants are charged separately and individually. However, in such instances, there is no guarantee such defendants—particularly in more populated counties—would even be prosecuted by the same prosecutor or sentenced by the same judge. One of the purposes, if not the primary purpose, of restitution "is to make a victim of a crime whole." *People v. Boots*, 2022 IL App (2d) 200640, ¶ 54. Defendant's interpretation would create unnecessary hurdles for trial courts to justly impose restitution. "Courts must construe statutes in a manner that will avoid absurd, unreasonable, or unjust results that the

legislature could not have intended." *Village of Chatham*, 2025 IL App (4th) 241112, ¶ 19. Additionally, our interpretation of section 5-5-6(c) is consistent with the common law doctrine of joint and several liability. "The common law doctrine of joint and several liability provides, in general, that when two or more defendants tortiously contribute to the same, indivisible injury, each defendant may be held jointly and severally liable for the entire injury." *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 423 (1997). "Significantly, under this doctrine, the plaintiff may recover compensation for the full amount of the injury from any one of [the] defendants responsible for the injury." *Id.*

¶ 58    In this case, the trial court, following a full and fair sentencing hearing, found restitution was appropriate. The other women involved on the night of the incident were charged separately and pleaded guilty separately in their own respective cases. See *People v. Reckers*, 251 Ill. App. 3d 790, 796 (1993) ("[A] defendant who has stood trial cannot properly compare his sentence with those imposed on persons who have pleaded guilty."). Therefore, we find the trial court properly ordered restitution consistent with section 5-5-6(c) of the Corrections Code.

¶ 59                     III. CONCLUSION

¶ 60    For the reasons stated, we affirm the trial court's judgment.

¶ 61    Affirmed.